**UNITED STATES of America**
**v.**
**Ronald Monroe FIELDS, Appellants in**
**No. 71–1218 et al.**

**Appeal of Louis Socrates DAVIS.**
**Nos. 71–1218, 71–1219.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 7, 1971.

Decided April 4, 1972.

---

5. See Whitlock v. United States, 429 F.2d 942, 944 (10th Cir. 1970); *cf.* Trigg v. Moseley, 433 F.2d 364, 366 (10th Cir. 1970).

H. David Rothman, Pittsburgh, Pa., for appellant in No. 71–1218.

Clayton A. Sweeney, Buchanan, Ingersoll, Rodewald, Klye & Buerger, Pittsburgh, Pa., for appellant in No. 71–1219.

Charles F. Scarlata, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before HASTIE, ALDISERT and JAMES ROSEN, Circuit Judges.

## OPINION OF THE COURT

HASTIE, Circuit Judge.

These appeals have been taken from convictions on all four counts of an indictment predicated upon alleged trafficking in narcotics.[1]

The incident that led to the indictment was the discovery of a quantity of

---

1. In the first count the defendants were charged with having conspired to "violate section 174 of Title 21, United States Code." In the second count they were charged under 26 U.S.C. § 4704(a) and 18 U.S.C. § 2 with having "purchase[d], dispense[d] and distribute[d] a quantity" of heroin "not in or from the original stamped package." In the third count they were charged under 21 U.S.C. § 174 and 18 U.S.C. § 2 with having received and concealed a quantity of heroin knowing that the heroin "[had] been imported . . . contrary to law." In the fourth count they were charged under 18 U.S.C. § 1952 with travel in interstate commerce to promote and carry on unlawful activities.

heroin in the flight bag of Dolores Butler at the Pittsburgh Airport shortly after she and the appellants, Fields and Davis, had debarked from an incoming plane. Thereafter, Mrs. Butler had given the authorities a detailed account of the alleged wrongdoing, picturing herself and Fields as participants, under the direction of Davis, in the transportation of narcotics from New York to Pittsburgh. Her testimony and the narcotics that had been found in her possession were the major items of the case for the prosecution.

For the appellants it is argued that the narcotics should have been excluded from evidence because federal agents had obtained them by illegal search and seizure. That contention is our first concern.

■ The actual or constructive possession of the seized narcotics was an essential element of each of the two charges upon which Fields and Davis were sentenced to imprisonment. Therefore, within the meaning of Rule 41(e), Federal Rules of Criminal Procedure, they are persons "aggrieved by" and thus entitled to challenge the search and seizure that yielded the contraband.

Jones v. United States, 1960, 362 U.S. 257, 261–265, 80 S.Ct. 725, 4 L.Ed.2d 697; United States v. West, 3d Cir. 1972, 453 F.2d 1351. Accordingly, they moved before trial for the suppression of the seized narcotics and, having failed in that effort, moved at trial, again unsuccessfully, to have this evidence excluded.

The following circumstances, disclosed at the suppression hearing or at trial, are relevant to a determination whether the search in question was lawful.

On Monday, December 22, 1969, at the Pittsburgh airport, special agents of the Federal Bureau of Narcotics and Dangerous Drugs observed the arrival of a TWA commercial plane from New York. They were on the lookout for certain black passengers who did not appear. However, they did observe the debarkation of three other Negroes, the appellants and a woman. The men carried no luggage. The woman carried a pocketbook and a TWA flight bag. One or more of the agents recognized Davis and Fields. None recognized the woman, who was identified later as Dolores Butler. Davis was known in the Bureau as a person believed to be illegally trafficking in narcotics and the Bureau had a similar report from the local police about Fields. The Bureau also had received a report from an informant, believed to be reliable, that Fields frequently went to New York and usually returned by plane on Monday accompanied by a woman who carried drugs for him. Because of this information the agents kept Davis, Fields and Mrs. Butler under observation as they passed through the airport. The three persons did not walk together or speak to each other. The agent who was observing Davis was able to observe Mrs. Butler at the same time. To him it seemed that Mrs. Butler recognized Davis but was intentionally avoiding contact with him. Davis left the airport without communicating with Fields or Mrs. Butler. Fields proceeded to the entrance of the passenger terminal where he ordered his car from the valet parking attendant. He had to wait some thirty minutes for the car. In the meantime Mrs. Butler waited nearby, avoiding any communication with Fields. To the agents observing her, she seemed nervous and ill at ease. When the car arrived Fields walked to the driver's side and Mrs. Butler to the car door on the opposite side.

At that point one agent accosted Fields and another accosted Mrs. Butler, each officer duly identifying himself. The agent who had approached Mrs. Butler asked her what was in her flight bag. She replied: "I don't know. It's Ronnie's," indicating Fields. With attention thus directed to him and without waiting for anything else to be said, Fields then exclaimed, according to his own testimony: "It is not! It is none of mine." Hearing these disclaimers, the officer who had introduced himself to Mrs. Butler asked her whether she

would mind if he looked into the flight bag. She replied: "No, it is not mine." The officer then extended his hand toward Mrs. Butler. She extended her hand holding the bag toward him. He took the bag, looked into it and saw what appeared to be narcotics and associated paraphernalia. The agents then took possession of the drugs and placed Fields and Mrs. Butler under arrest.

Since the searching of the flight bag was the critical procedure, we have examined the record to see what it discloses about that item of hand luggage. Mrs. Butler, a resident of Pittsburgh, had taken the flight bag with her to New York where, according to her testimony, she had gone to Davis' apartment. On that trip she carried her cosmetic bag and "a couple of books" in the flight bag. She also testified that, at the apartment "I took my books out [of the flight bag] and I think my cosmetic bag was still in there." Then, she said, Davis "had some powder on the table and some capsules and he bundled them up and . . . told me to put them in my flight bag and carry them, I could carry them on the plane."

It is not clear whether Mrs. Butler owned the flight bag. She repeatedly referred to it as "my flight bag." In addition, there is some indication that Fields, who had purchased their tickets in Pittsburgh for the trip to New York, may have procured the flight bag for her at that time. In any event, it is clear that she had possession of the bag for use in carrying such small items as an air traveler would wish to have at hand during a flight. Of course it may also have been comtemplated that the flight bag, as a familiar article of hand luggage, would attract no attention and thus would safely conceal a quantity of narcotics on the return trip. In any event, the record establishes that the flight bag was owned by either Fields or Mrs. Butler and was in her possession for use as hand luggage on her trip from Pittsburgh to New York and return.

In this factual setting, we now consider the government's contention that Mrs. Butler and Fields so acquiesced in the inspection of the flight bag as to make what followed a "reasonable" search that did not contravene the Fourth Amendment.

■ It is doubtful whether the information possessed by the federal agents, supplemented by their observation of the suspects, supplied probable cause adequate to justify a search of the flight bag *in invitum*. However, such probable cause is not necessary to justify stopping and questioning a suspect where the accosting officer has information and has observed conduct that has caused him reasonably to suspect that a crime is being or is about to be committed. Thus, in approving a "stop and frisk" procedure, the Supreme Court has said that " . . . necessarily swift action predicated upon the on-the-spot observations of the officer on the beat— which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case, must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." The Court added that "there is 'no ready test for determining reasonableness other than balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' " Terry v. Ohio, 1968, 392 U.S. 1, 20, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889.

■ We think this language is applicable to the situation with which the narcotics agents were confronted here. What they had been told about participation of Davis and Fields in the narcotics traffic and their own observations at the airport, which were consistent with and practically confirmed the reports of Monday arrivals by Fields and a woman with narcotics, provided very substantial grounds for suspecting that they were witnessing the transportation of narcotics. In these circumstnaces, it was their privilege, indeed their responsibility, to

stop Fields and Mrs. Butler, to make pointed inquiry and to request permission to examine the flight bag. In so ruling, we do not sanction or in any way condone the stopping and harassing of persons merely because they have criminal records or bad reputations.

If Mrs. Butler owned the bag, she obviously had authority to permit its inspection. United States v. West, *supra*. If Fields owned it and had permitted her to use it as hand luggage on a trip, it may well be that she had authority to give effective consent to its inspection. *Cf.* Sartain v. United States, 9th Cir. 1962, 303 F.2d 859. But we need not decide that point because, immediately before the agent solicited Mrs. Butler's permission to inspect the bag, Fields had disclaimed any interest in or authority over it. The other appellant, Davis, was not present on this occasion and the record in no way suggests that he had any proprietary interest in the flight bag that might require his consent to its examination while in Mrs. Butler's possession.

■ Beyond the question of Mrs. Butler's authority in the premises, it has been argued that her acquiescence in the search was not voluntary since she was responding to a request by a federal officer. But that fact alone is not enough to make her acquiescence involuntary. Frazier v. Cupp, 1969, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; Government of the Virgin Islands v. Berne, 3d Cir. 1969, 412 F.2d 1055, cert. denied 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87, rehearing denied 396 U.S. 937, 90 S.Ct. 261, 24 L.Ed.2d 239. And there was nothing else to indicate coercion. The officers made no show of force and they made no threats. They did not exert pressure upon Mrs. Butler in any way. *Cf.* United States ex rel. Harris v. Hendricks, 3d Cir. 1970, 423 F.2d 1096.

Moreover, Mrs. Butler showed no reluctance or unwillingness to permit an inspection of her flight bag. As we said in the *Berne* case, "if by his words or actions the accused indicates that he

does not expect to be afforded the right to security or privacy which the law might otherwise afford, then there is no rational purpose for invoking a rule to create such a right." 412 F.2d at 1061. In this case we are more willing to accept at face value the traveler's manifestation of consent to a cursory inspection of her hand luggage because this involved only a minimal encroachment on privacy. The officers proposed nothing inherently offensive, like a body search, and nothing severely intrusive, like a search of one's home.

In brief, the record adequately shows that Mrs. Butler, without any coercion by the inquiring officers, effectively consented to their search of her hand luggage. The inspection that followed and resulted in the discovery and seizure of contraband was not an "unreasonable search" within the prohibition of the Fourth Amendment. *Cf.* Frazier v. Cupp, *supra;* United States ex rel Harris v. Hendricks, *supra;* Sartain v. United States, *supra;* United States v. Walker, 2d Cir. 1951, 190 F.2d 481.

It remains to consider a contention by Davis that, as against him, the trial court committed reversible error by permitting his co-defendant Fields to call Davis' wife as a witness and to interrogate her about matters relevant to the charges against both defendants. When counsel for Fields called Mrs. Davis to testify, counsel for Davis objected, arguing that the court should either rule that the witness was incompetent or grant Davis a severance. The court permitted Mrs. Davis to testify and refused to grant a severance. However, the court did instruct counsel that examination should be limited to matters which would not incriminate or inculpate appellant Davis.

■ It is an established rule of evidence in federal courts that neither spouse is a competent witness to testify against the other. Hawkins v. United States, 1958, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125; Paul v. United States, 3d Cir. 1935, 79 F.2d 561. However, the

Hawkins case rejects so much of the old common law rule as made one spouse incompetent as a witness for the other spouse. The exclusionary rule as now limited creates a problem where testimony by the spouse of one defendant is sought by a co-defendant. For the spouse who is a defendant may fear that his defense will be prejudiced, even unintentionally, by some testimony of his spouse or by the very fact that she testifies for a co-defendant and not for him. In this situation, the proper procedure is to grant a severance and then permit the witness to testify for the defendant who is not his or her spouse. Therefore, the court's refusal to grant Davis a severance when Fields called Mrs. Davis as his witness was error.

■ However, our study of the record has convinced us that in this case the error proved harmless. Mrs. Butler had testified at length for the prosecution concerning the circumstances and details of her trip to New York that culminated in the discovery of narcotics in her flight bag when she returned to Pittsburgh. She had identified Davis as the person who had employed her to transport the narcotics and who, in the presence of Fields, had given the narcotics to her in Davis' New York apartment. She also had testified that, at Davis' suggestion and invitation, she had remained overnight at the apartment before returning to Pittsburgh.

Mrs. Davis contradicted this vital testimony. She testified that the apartment was her residence and that she had been there throughout the time of Mrs. Butler's alleged visit. She steadfastly denied that Mrs. Butler or Fields had even visited the apartment, much less remained over night. Thus, her testimony, if believed, would have served to exculpate both Fields and her husband.

It is true that Mrs. Davis also testified that she and her husband had been estranged for almost a year immediately preceding the time in controversy and that her husband had moved to Pittsburgh where he had an interest in a window cleaning business. However, he retained his New York apartment where she remained. Moreover, she said that her husband, while residing in Pittsburgh made trips to New York, about the middle of each month. This pattern of travel, as disclosed by Mrs. Davis, was consistent with the government's theory that Davis, while based in Pittsburgh, was acquiring narcotics from sources in New York and causing them to be transported to and marketed in Pittsburgh, although Mrs. Davis' testimony in no way suggested that these New York visits were for any improper purpose. Indeed, she attributed the visit involved in this case to her husband's desire to achieve a reconciliation at a time when her birthday was imminent.

Thus, any primary probative effect Mrs. Davis' testimony may have had must have been helpful to her husband as a direct contradiction of Mrs. Butler's testimony that he had given the narcotics to her to transport for him. On the other hand, any inference that Davis' earlier visits were for an illegal purpose, would have to be drawn contrary to Mrs. Davis' testimony, not as an implication from it. And no unfavorable inference could reasonably be drawn from the fact that she was called as a witness for Fields, since her contradiction of Mrs. Butler's testimony was equally helpful to both defendants. From a different approach, the rule of Hawkins v. United States, *supra*, reflects public policy to protect the marital relationship from alienation likely to attend testimony by one spouse against the other. Nothing said or implied in Mrs. Davis' testimony could cause a rational husband to believe that his wife was even unintentionally facilitating the effort of the prosecution to convict him of a crime. Accordingly, we conclude that the admission of Mrs. Davis' testimony over her husband's objection was harmless error.

The appellants have called to our attention other alleged errors. We have considered all of their contentions and are not persuaded by any of them.

The convictions of both appellants will be affirmed.