**UNITED STATES of America**

v.

**Lonnie F. LAMPKIN, Appellant.**

**No. 72-1066.**

United States Court of Appeals, Third Circuit.

Argued April 14, 1972.

Decided June 27, 1972.

---

Byrd R. Brown, Pittsburgh, Pa., for appellant.

Charles F. Scarlata, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Before McLAUGHLIN, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

This appeal is from an order of the district court denying appellant's motion to suppress evidence taken from appellant's person under circumstances which he contends were not based on probable cause sufficient to justify the arrest, search, and subsequent seizure.

Three federal narcotics agents, while driving towards the Pittsburgh airport, observed a Cadillac Eldorado with two occupants, proceeding in the same direction. One agent recognized one of the occupants as someone whom he had seen previously while doing undercover narcotics work in the Pittsburgh area. He also recognized the car itself. He therefore radioed his Pittsburgh headquarters and obtained a vehicle registration check on the Eldorado. The reply stated that the vehicle belonged to Lonnie F. Lampkin (Transcript P. 5) and the surname Lampkin was remembered by the agent as the surname of a person suspected by the Narcotics Bureau of being a drug trafficker. He then requested that the Pittsburgh Police Narcotics Squad be consulted for information concerning Lampkin. The Squad advised that there was a state warrant outstanding for the arrest of Lampkin on the charge of illegal sale of narcotics. Moreover, Lampkin's suspected source of supply was in New York City (Transcript P. 7). Due to this information, the federal agents followed the subject automobile to the Pittsburgh airport where the passenger left the car and purchased a ticket on United Airlines flight 688 to Newark, New Jersey, a New York terminal, under the name of Gene McClary. The car was driven back towards Pittsburgh while the passenger inquired about flights returning that day from the New York area to Pittsburgh. He then boarded the flight to Newark, whereupon the agents telephoned the Newark office of the Narcotics Bureau and requested a surveillance of the subject. The Newark officers observed the subject arrive and followed him to New York City where they lost his trail in Harlem, in the vicinity of 149th Street and 10th Avenue (Transcript P. 10). The agents continued their surveillance of the Pittsburgh airport, concentrating on the times of plane arrivals from New York. At about 5:45 P.M. on the same day, the agents observed the individual who had driven the Eldorado that morning, enter the Pittsburgh airport terminal with another person, go to the T.W.A. counter to inquire about the arrival of T.W.A. flight 755 from New York, and then went to Gate 10 where a flight was expected to arrive. The person who had been the passenger in the Cadillac that morning came through Gate 10, joined the driver and his companion, and all three proceeded outside to an automobile parked along the approach driveway. The agents followed them and approached with guns drawn. They stated that they

were federal agents and asked appellant to identify himself, whereupon he stated that his name was Lonnie F. Lampkin. The agents searched Lampkin for concealed weapons and narcotics. An envelope containing 12.89 grams of heroin was found on Lampkin.

The problem involved is whether the arrest, search, and subsequent seizure of narcotics were effected with sufficient probable cause to satisfy the constitutional standard of reasonableness. As to that it is most important to ascertain whether the arrest was proper for if it were, under facts evident at that time, the subsequent search and seizure would plainly be valid. 5 Am.Jur.2d 695, 6 defines arrest as "the taking, seizing, or detaining of the person of another * * * (2) by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest. * * * To effect an arrest, there must be actual or constructive seizure or detention of the person arrested, or his voluntary submission to custody and the restraint must be under real or pretended legal authority. There can be no arrest where there is no restraint, or where the person sought to be arrested is not conscious of any restraint. * * * If the person arrested understands that he is in the power of the one arresting and submits in consequence, it is not necessary that there be an application of actual force, a manual touching of the body, or a physical restraint that may be visible to the eye." Accordingly, it seems evident that, under the circumstances before us, the arrest was effectuated at the instant the agents, with guns drawn, halted appellant and informed him of who they were. At that instant he was under the control of the officers who had demonstrated an intention to take him into custody under their authority as government agents. There was absolute restraint of appellant which was abundantly clear to him. At that instant there was an intent by the officers to arrest accompanied by a seizure or de-

tention of the person which was so understood by the person arrested. Thus the arrest which needs be examined for probable cause was made at that time, which was before appellant had been asked his name.

In passing on a warrantless arrest and subsequent search, a court must determine whether "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the petitioner had been or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Reviewing courts may make an independent examination of the facts, the findings, and the record in order to determine whether the criteria of probable cause are met. United States v. Ford Thunderbird, 445 F.2d 1064, 1069 (3 Cir. 1971). It is therefore essential to examine the facts which the agents possessed and relied on in proceeding without a warrant and from those facts to determine whether these were sufficient to establish probable cause. The latter varies with circumstances and must be founded on facts sufficient in themselves, independent from an individual's personal feelings or beliefs. That is, whether at that moment (of arrest) "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1929)." Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). In Beck v. Ohio, supra, it was inferred that an officer's mere knowledge of defendant's physical appearance and previous record alone, would not be enough to constitute probable cause. In this appeal there is much more than a past

criminal association. There were far too many interrelated factors to have been the result of pure coincidence. First of all, the former undercover agent recognized one of the occupants of the car and associated the car itself with his previous undercover narcotics work. Other pertinent elements were that the auto was registered to one whose name had previously been linked with wrongful narcotics activities; that those activities seemed to center between Pittsburgh and New York; that this suspect's flight was going to the New York area; and that he was interested in an immediate return. Appellant's outward journey actually ended in Harlem in close proximity to a store run by a man already suspected of drug trafficking between New York and Pittsburgh, and a return flight to Pittsburgh took place early that same day. A further reason for the agent's actions was the police report (which is now thought to have been seemingly erroneous) that there was a state warrant existing for Lampkin to whom the car was registered. Considering all these factors, it is obvious that each incident corroborated the existing belief of the agent. There were too many factors which "fell into place" and thus probable cause in such circumstances seems readily existent.

■ With regards to the alleged warrant, Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) allows law enforcement officials to rely on radio bulletins in effecting an arrest. It adds, however, that if such bulletins turn out to be false, "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." Such rationale might be extended to apply to an instance as is before us. That is, if the arrest, without the added factor of the alleged warrant, would have been considered illegal, then it could not stand, because of the mistaken warrant information. But it is clear in this appeal, that probable cause existed irrespective of the questionable warrant and therefore the arrest could not be termed "otherwise illegal." The agent had stated that the name of the suspect didn't matter to him. Under the existing facts, he would have arrested this individual, no matter what his name, which showed no real dependence on the alleged warrant. The arrest was not based on appellant's identity or the outstanding warrant, but on suspicion of violation of federal narcotics laws which arose due to the totality of circumstances which took place and were observed by the agents on June 3, 1970. This is all that needs to be considered concerning the probable cause to arrest determination. See also the United States Supreme Court decision of June 12, 1972 in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

Appellant cites Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) as sustaining his allegation of no probable cause. In Henry, the situation arose concerning the theft of an interstate whiskey shipment. Those agents were observing persons because of a statement by one of the suspect's boss containing information of an undisclosed nature, which supposedly implicated the suspect with regards to interstate shipments. This statement never went so far as to allege that its maker had an actual suspicion that these individuals had committed the thefts. Those defendants merely stopped by an alley, picked up some packages and drove away. The agents observed them do this twice and were never close enough to see the size, number, or contents of the packages. Nonetheless, they waived the car to a stop and after overhearing some evasive comments by the persons in question, proceeded to search the vehicle. Under those facts the Court rightly held there was no probable cause for arrest. Far in excess of the Henry particulars was the belief which a reasonable man could have and did form in this appeal, due to the abundance of undeniable major information connected

with appellant which was more than sufficient to meet the standard of probable cause.

■ Finally there is a somewhat similar recent opinion, United States v. Fields, Davis & Butler, 1972, 458 F.2d 1194 (3 Cir. 1972) where on its particular facts it was mentioned, but never so decided, that "it is doubtful whether the information possessed by the federal agents, supplemented by their observation of the suspects, supplied probable cause adequate to justify a search of the flight bag *in invitum*." We most assuredly agree with Fields to the effect that mere association or consorting with drug traffickers does not give rise to probable cause. In this appeal, the solid evidence developed by the agents is completely beyond the Fields situation. There, agents awaiting *other* suspects at the airport, saw defendants coming off a plane and recognized two of them as believed traffickers in narcotics and associated this with previous information from an informant who said that these individuals usually returned on Mondays (which this was) with the drugs to be sold. The agents continued to observe the three and after some suspicious activity stopped them to search a flight bag carried by the woman whom they had not recognized. It is the facts leading to that confrontation which distinguishes Fields from this appeal as those were the facts referred to by the Fields court as likely to be insufficient for probable cause to arrest. In Fields the suspicion of the agents began and was predicated upon the movements of the suspects *after* their arrival at the Pittsburgh airport. Those agents possessed no knowledge of where the suspects had come from. They just happened to recognize their faces and associate them with an informer's tip that these two men and a woman usually returned on Mondays with the woman carrying illegal drugs. There the charge was mostly left to chance and surmise. In this appeal the agents had identified appellant and his car before he left; they also checked the auto registration which was held by a suspected drug trafficker named Lampkin. They had knowledge that one of Lampkin's source of drugs was somewhere in New York. They knew that the car passenger had gone to New York, to the close proximity of the store of a man who had for some time been suspected of illegal drug activity between New York and Pittsburgh. It was following all that and Lampkin's return to Pittsburgh a few short hours after arriving in New York, together with this tight background of the suspect's activities on the day in question, that they proceeded to arrest, with a judgment call that they had justifiable probable cause. Quite obviously this arrest was no haphazard venture. It is validly distinguishable from Fields. The conclusion by the agents of probable cause to arrest was sensibly reached under the entire circumstances. Even if the individual had not been Lampkin, his activities had been of such a nature to call for his arrest as a person plainly connected with illegal drug transportation. He was readily identified by the agent as tied into illegal drug traffic from his course of conduct which he had followed on the day in question.

Admittedly the agents were faced with a major emergency. Granting that, if their information was specious or merely vague guesswork, the necessity for prompt action could not be used as an excuse for a warrantless arrest. We are not bothered with that sort of problem. The agents in this matter by prompt, experienced attention had produced facts indicating that appellant was then engaged in an unlawful narcotics transaction. They had no time to obtain a bench warrant. Narcotics are generally known as a readily disposable commodity and in recognition of this a special section for the narcotics law has been enacted to allow customs agents, a heading under which narcotics agents would be included, some flexibility in their arrest procedure. 26 U.S.C. § 7607 as amended on October 27, 1970 provides

that "officers of the customs may make arrests without a warrant for violation of any law of the United States relating to narcotic drugs (as defined in § 102(16) of the Controlled Substances Act) or marihuana (as defined in 102(15) of the Controlled Substances Act) where a violation is committed in the presence of a person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The re-arrival of Lampkin in Pittsburgh was the closing element in the agents' determination of probable cause. They had no choice but to apprehend this individual at that time. As we have seen there was no opportunity to obtain a warrant since appellant could easily have disposed of the drugs. Probable cause did exist. In our judgment the arrest was validly made.

■ One remaining query is whether or not the search, which produced the heroin in possession of appellant, was reasonable and incident to the lawful arrest. When the arrest is valid, petitioner's person and immediate surroundings can lawfully be searched. The right to search the person incident to arrest always have been recognized in this country and in England. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914); United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Since the drug was found in Lampkin's pocket and the arrest valid, the heroin was lawfully discovered and held by the agents. The motion to suppress it must accordingly be denied.

The judgment of the district court will be affirmed.

VAN DUSEN, Circuit Judge (dissenting).

I respectfully dissent from the majority's conclusion that the federal agents had constitutionally adequate probable cause to arrest and search Lampkin as they did at the Greater Pittsburgh Airport Terminal on June 3, 1970, and believe that at the least the judgment of conviction and sentence should be vacated and the case remanded to the district court for further findings in light of the Supreme Court's decision in Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). I agree with the majority that Lampkin was arrested at the instant that the federal agents approached him with their guns drawn and detained him, before they had asked him his name, and that this detention was not simply a "stop and frisk" which may be justified by less stringent probable cause standards, see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Fields, 458 F. 2d 1194 (3d Cir., 1972). Thus, as the majority states, whether Lampkin's arrest was constitutionally valid will depend upon whether the record before the district court supports the conclusion that at the moment that the federal officers approached Lampkin "the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the petitioner had been or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).[1]

The only evidence introduced at the pre-trial suppression hearing conducted on January 18, 1971, was the testimony

---

1. It is settled that the term "reasonable cause" in 26 U.S.C. § 7607, cited by the majority, is substantially equivalent to the term "probable cause" in the Fourth Amendment. See e. g., Draper v. United States, 358 U.S. 307, 310 n. 3, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Simon, 409 F.2d 474 (7th Cir.), cert. denied, 396 U.S. 829, 90 S.Ct. 79, 24 L. Ed.2d 79 (1969); Rocha v. United States, 387 F.2d 1019, 1022 n. 2 (9th Cir. 1967), cert. denied, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); United States v. Burruss, 306 F.Supp. 915, 918 (E.D. Pa.1969).

of Agent Sheid, a special agent with the United States Bureau of Narcotics and Dangerous Drugs. Agent Sheid testified that on the morning of June 3, 1970, as he and two other special agents were proceeding west on Interstate 76 toward the Greater Pittsburgh Airport, they observed a 1967 Cadillac car occupied by "two male Negro individuals" also proceeding toward the airport. N.T. 3–4. When asked on direct examination whether he recognized either of the two occupants of the automobile, Agent Sheid declared:

> "I recognized them only to the extent that I thought that I had perhaps seen one of them earlier, prior to that occasion . . . [d]uring my work as an undercover agent in the Hill District of Pittsburgh, Pennsylvania." N.T. 4.

On cross-examination, however, Agent Sheid acknowledged that he had never seen the passenger of the vehicle before (who was, in fact, the defendant Lampkin) and did not know his name (N.T. 16), so that it must have been the driver of the automobile that he had "thought" that he "had perhaps seen" earlier. Apparently because of this identification and the fact that Agent Sheid "thought that [he] had seen this subject vehicle in the Hill District of Pittsburgh" (N.T. 4), Agent Sheid radioed the Pittsburgh office of the Bureau for a registration check on the car while the agents followed it to the airport (N.T. 4–5). The Pittsburgh office reported that the automobile was registered in the name of Lonnie F. Lampkin. N.T. 5. Since the name Lampkin was familiar to Agent Sheid as the surname of a Joseph Lampkin, whose name was included in the narcotics files of the Pittsburgh District Office of the Bureau, Agent Sheid ordered the Pittsburgh office to contact the City of Pittsburgh Narcotics Squad for any additional information they could provide. N.T. 5, 17–18.

The Pittsburgh Police Department reported, according to Agent Sheid, that "Lonny F. Lampkin was the name which appeared on an arrest warrant charging him with illegal sale of narcotics in violation of Pennsylvania Drug, Device, and Cosmetic Act" and that "Lonny F. Lampkin was currently under investigation by their department and was a known narcotics dealer in the city of Pittsburgh, and the fact that his suspected source of supply was in New York City." N.T. 7.

When the vehicle registered in the name of Lonnie F. Lampkin arrived at the airport, two agents followed the passenger (actually the defendant Lampkin) to a ticket counter and determined that he purchased a ticket in the name of Gene McClary for a flight to Newark, New Jersey, leaving that morning. N.T. 6. After "Gene McClary" got on the plane, a request was made by the Pittsburgh office to the Newark office to follow him after his arrival in Newark. N.T. 7–8. The Newark agents reported to Agent Sheid that after arriving in Newark, the suspect inquired at a ticket counter about a return flight to Pittsburgh that day and then went into the New York City area, where they lost sight of him. Under prodding from the prosecutor, Agent Sheid acknowledged that the surveillance of Lampkin was "discontinued in the neighborhood of Pratt's residence or place of business" (N.T. 9), and that Pratt was a "well known trafficker in large quantities of narcotics" (N.T. 11). However, there is no indication in the record that the fact that the Newark agents lost track of the suspect "in the vicinity of Pratts" was known by the agents at the moment of their arrest of Lampkin, which is the critical time on the issue of whether there was probable cause to arrest. See, e. g., Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Agent Sheid did not, directly or indirectly, indicate that he had this information prior to arrest and, in fact, when asked whether he received any other report concerning the defendant Lampkin from the time that his airplane left the Pittsburgh airport until the time he arrested him, Agent Sheid testified that

he did not. N.T. 23. Since the district court made absolutely no mention of Pratt in its opinion (including its 21-paragraph findings of fact), it seems clear that this information was learned by the arresting officers after the arrest.[2]

Meanwhile, Agent Sheid remained at the Pittsburgh airport and obtained information regarding return flights from the New York area. N.T. 11. Later that afternoon he saw the same individual who had driven Lampkin to the airport in the morning enter the airport and meet Lampkin and proceed to a Ford Thunderbird automobile (not the Cadillac that they had driven to the airport in the morning). N.T. 12–13. As these men began to enter the car, the federal agents approached with their guns drawn and arrested both Lampkin and his companion (N.T. 13, Stipulation of January 18, 1971).

What then did the federal agents know about Lampkin that would have given them probable cause to arrest him at the moment that they did? The record in this case indicates that all these agents knew at the time of arrest was that Lampkin (whom the agents did not recognize) was driven to the airport for a one-day trip to New York City by another male Negro individual whom one of the agents "thought that [he] had perhaps seen . . . earlier" in a car which this same agent "thought that [he] had seen . . . in the Hill District of Pittsburgh" and which was registered in the name of Lonnie F. Lampkin, that the name Lampkin was familiar to the federal agent as the last name of one "suspected of being a drug trafficker," and that the Pittsburgh Police had reported that Lonnie F. Lamp-

kin was the subject of a state arrest warrant charging him with illegal sale of narcotics and was "currently under investigation" as "a known narcotics dealer in the city of Pittsburgh" with a "suspected source of narcotics . . . in New York."

I believe that at the least the Supreme Court's recent decision in *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), requires this court to remand this case to the district court for further findings of fact. In *Whiteley* the Court held that, although in general a police officer acting pursuant to an arrest warrant is entitled to assume that the warrant is based upon probable cause, if this is not the case the fact of the warrant cannot justify an "otherwise illegal" arrest. See 401 U.S. at 568, 91 S.Ct. 1031. In the instant case, the majority acknowledges that the Pittsburgh Police Department report of an outstanding state arrest warrant for Lonnie F. Lampkin for narcotics violations "is now thought to have been seemingly erroneous," but declares that *Whiteley* is not controlling because "it is clear in this appeal, that probable cause existed irrespective of the questionable warrant and therefore the arrest could not be termed 'otherwise illegal.'" But if the Pittsburgh Police Department report of a state arrest warrant is to be discounted as "seemingly erroneous," then I would think it also possible that the contemporaneously received Pittsburgh Police Department report that Lonnie F. Lampkin was "currently under investigation" as "a known narcotics dealer in the city of Pittsburgh" with a "suspected source of narcotics . . . in New York" is also "seemingly erroneous."[3] The district court, whose

---

2. Testimony at Lampkin's sentencing proceeding is consistent with the acquisition of this information after the arrest. At the sentencing proceeding held on December 15, 1971, Special Agent Lund, of the Federal Bureau of Narcotics and Dangerous Drugs, testified that after Lampkin was arrested he cooperated with the Bureau and told them that he had been sent to New York by his father to purchase narcotics from someone named Pratt. N. T. 6–7.

3. At Lampkin's sentencing hearing, Special Agent Lund acknowledged that it was Lampkin's father who was suspected and had a reputation of being involved in the narcotics traffic and that the defendant Lampkin "wasn't known to us to the best of our knowledge." N.T. 6–7.

decision was announced on February 23, 1971, more than a month before the Supreme Court announced its decision in *Whiteley* on March 29, 1971, made no findings as to whether either of the reports by the Pittsburgh Police Department was substantially true. I believe that at the least this court should remand this case to the district court for findings as to whether the reports received from the Pittsburgh Police Department were substantially accurate, since without this information I think it is clear that the arrest was "otherwise illegal."

However, assuming that the arresting agents were entitled to rely on the report of the Pittsburgh Police Department that Lonnie F. Lampkin was a "known narcotics dealer" in Pittsburgh with a suspected source of narcotics in New York City, I believe that these agents did not have probable cause to arrest the defendant Lampkin at the time that they did so. The record reveals that at the time of arrest, before Lampkin had been asked his name, the federal agents knew only that Lampkin (whom none of the agents recognized or identified) had been driven to the Pittsburgh airport for a one-day trip to New York City by a man that one of the undercover agents "thought that [he] had perhaps seen" earlier in a car which was registered in the name of one identified by the Pittsburgh police as a "known narcotics dealer" with a "suspected source of narcotics in New York City," and was about to be driven from the airport by this same man in a different car. At the time of arrest, the agents had no reason to believe that Lampkin was not Gene McClary, the name he had used on the flight to Newark. Officer Sheid testified that he did not assume that the person he arrested was Lonnie F. Lampkin (N.T. 2) and that, in fact, he would have placed him under arrest even if Lampkin had said that his name was McClary (N.T. 24). In these circumstances, the information possessed by the federal agents at the time of their arrest of Lampkin does not seem "sufficient to warrant a prudent man in believing that the petitioner had been or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

In Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court held that a policeman could not constitutionally arrest Sibron merely because the officer saw Sibron talking to a number of known narcotics addicts over a period of eight hours in circumstances in which narcotics may have been transferred. A different result in this case would be contrary to *Sibron*, particularly since Lampkin was never even seen in the company of a known narcotics addict or trafficker (at most, he was in such a person's car), and the narcotics agents had no specific reason to believe that Lampkin had an illegal reason for taking a one-day trip to New York from Pittsburgh. It may well be that in both cases the police had their suspicions aroused because of the *capacity* for illegal activity inherent in the suspects' activities. But unless the constitutional standard for effecting an arrest (as opposed to a "stop and frisk") is to be relaxed to include mere suspicion, I do not see how an arrest can be justified.

Dicta from the recent decision of this court in United States v. Fields, 458 F.2d 1194 (3d Cir., 1972), supports the view that there was no probable cause to arrest Lampkin at the moment that he was arrested. In *Fields*, special agents of the Federal Bureau of Narcotics and Dangerous Drugs, while waiting at the Pittsburgh airport on Monday, December 22, 1969, for several embarking passengers who did not appear, observed the debarkation of three Negro passengers, two men and a woman. The men carried no luggage and the woman carried a pocketbook and a flight bag. At least one of the narcotics agents, actually recognized both of the men, Fields and Davis, as persons believed to be illegally trafficking in narcotics and knew of a Bureau report from an informant (believed to be reliable) that Fields fre-

quently went to New York and usually returned by plane on Monday accompanied by a woman who carried drugs for him. The narcotics agents kept Davis, Fields and the woman under surveillance and noted that they did not walk together or speak to one another and, in fact, the woman appeared to be intentionally avoiding contact with Davis. After Davis left the airport, Fields waited in the entrance to the passenger terminal about 30 minutes while parking attendants got his car. The woman waited nearby, apparently nervous and ill at ease, but not communicating with Fields. When the car finally arrived. Fields walked to the driver's side and the woman walked to the passenger's door. At this point the federal agents stopped Fields and the woman and asked the woman what was in her flight bag. The woman responded that the bag belonged to Fields, who immediately exclaimed that it was not his. The agent then asked to look into the flight bag and she obliged by extending it to him, although maintaining that it was not hers.

In these circumstances, the Court declared that "[i]t is doubtful whether the information possessed by the federal agents, supplemented by their observation of the suspects, supplied probable cause to justify a search of the flight bag *in invitum*" (458 F.2d at 1197). If there was not probable cause to arrest the suspects in *Fields* and search the flight bag, *a fortiori* there was not probable cause to arrest Lampkin as the officers did in the instant case. In *Fields* the narcotics agents stopped an individual who was known to them as a suspected narcotics trafficker behaving suspiciously and acting consistently with a reliably reported *modus operandi*. In the instant case, in contrast, the narcotics agents arrested an individual whom they had never seen or heard of before, whose specific actions were not unusual, and who was not acting consistent with any specific *modus operandi* characteristic of a criminal enterprise. I recognize, of course, that local and federal law enforcement officials must be given

reasonable latitude if the safety and welfare of the community are to be maintained, particularly so in the case of narcotics traffic, which is both insidious and difficult to detect and prevent. Thus, in *Fields*, Judge Hastie, speaking for this court, declared that the narcotics agents had a privilege, indeed a responsibility, to stop Fields and his woman companion in order to question them and ask to examine the flight bag. But Judge Hastie followed this declaration with the following caution:

"In so ruling, we do not sanction or in any way condone the stopping and harassing of persons merely because they have criminal records or bad reputations."

458 F.2d at 1198.

I believe that Lampkin's arrest under the circumstances presented in the record constituted a violation of the Fourth Amendment and would reverse the judgment of conviction.