GOVERNMENT OF THE VIRGIN ISLANDS, Appellee

v.

FELIX CARRION HERNANDEZ, Appellant

No. 74-1654

United States Court of Appeals

Third Circuit

Argued December 6, 1974

Filed January 31, 1975

STANLEY M. POPLOW, ESQ. (POPLOW & ABRAMSON), Philadelphia, Pa., *for appellant*

JOHN S. WILBUR, JR., ESQ., United States Attorney, ROBERT S. TIGNOR, ESQ., Assistant United States Attorney, Charlotte Amalie, V.I., *for appellee*

Before SEITZ, *Chief Judge*, VAN DUSEN and ROSENN, *Circuit Judges*

### OPINION OF THE COURT

ROSENN, *Circuit Judge*

After a jury trial in the United States District Court of the Virgin Islands, the defendant was convicted of distributing a controlled substance[1] and was sentenced to fifteen years' imprisonment to be followed by a special parole term of three years. The principal issue raised by the defendant on appeal is whether the district court erred in failing to suppress evidence seized from him at the time of his arrest. We affirm.

## I

At the trial, the Government of the Virgin Islands introduced the testimony of an informant who allegedly purchased heroin from the defendant, as well as the testimony of a policeman who observed part of the alleged transaction. In corroboration of this testimony, the Government introduced in evidence a ten dollar bill found on the defendant at the time of his arrest. This ten dollar bill, whose serial number had been recorded by the police before

---

[1] 19 V.I.C. § 604.

the alleged transaction, had been given to the informant for the purpose of purchasing heroin.

In advance of trial, the defendant moved to suppress the ten dollar bill. Although a search warrant for the defendant's person had been issued prior to his arrest,[2] the Government's principal argument at the pretrial suppression hearing was that the search, which netted the ten dollar bill, was valid as incident to a lawful arrest. The district court denied the defendant's motion to suppress, ruling that probable cause existed for defendant's arrest and that an arrest warrant was not required.

The record of the suppression hearing reveals the following facts. On the morning of April 23, 1974, Officers Marcano and Wells of the Joint Narcotics Strike Force arrived at the home of Stephen Henthorn, whom they had arrested for possession of heroin the day before. After searching Henthorn and removing all objects found in his pockets, the officers returned Henthorn's wallet containing only a ten and a twenty dollar bill, having first recorded the serial numbers on the bills. The trio then proceeded by car to a point on Mafolie mountain overlooking a house known as No. 10 Hospital Line (No. 10) where Henthorn was to attempt to make a purchase of heroin. Officer Marcano there alighted and set up a telescopic device with which he could observe what was to occur below. Henthorn and Officer Wells then drove back down the mountain. Henthorn got out of the car and walked the rest of the way to No. 10.

Officer Marcano testified at the suppression hearing that, using the 40 power telescopic device, he observed No. 10 from a distance of approximately two hectometers (118.72

---

[2] The affidavit which served as the basis for issuing the search warrant contained several inaccurate or misleading statements. Many of these defects were inexcusable and reflect poorly on the Department of Public Safety's joint Narcotics Strike Force. Although the validity of the search warrant is not an issue on this appeal, nonetheless we express our displeasure with police conduct which fails to give due regard to the constitutional rights of the public.

yards). Through the open door, Officer Marcano stated that he could "not completely" see what was happening inside No. 10. He did testify, however, that he observed Henthorn hand "something" to the defendant.

■ After Henthorn emerged from the house, he met Officer Wells back at the car. They then picked up Officer Marcano, who testified that, five minutes after the alleged transaction in No. 10, Henthorn produced "three decks of heroin"[3] and gave them to Officer Wells. Some eight members of the Joint Narcotics Strike Force arrested defendant in the yard behind No. 10 at approximately six o'clock that evening. A search of the defendant's person yielded the recorded ten dollar bill.

The question here involved is whether "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the [defendant] had been or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964); see United States v. Lampkin, 464 F.2d 1093, 1095 (3d Cir. 1972). If the arrest was lawful, the search incident thereto was valid as well.

■ We believe that the record of the suppression hearing demonstrates that the officers had probable cause when they arrested the defendant. They knew that Henthorn entered No. 10 without any heroin in his possession and that he emerged with three packages which appeared to contain heroin. Moreover, when he rejoined Officers Marcano and Wells, Henthorn no longer had the thirty dollars which they had given him. Officer Marcano, it must be admitted, was

---

[3] The testimony of the Government's expert witness at trial raised some question whether the color obtained in the officers' field test for heroin indicated a positive result. In light of the defendant's failure to move at that point for reconsideration of his motion to suppress, we do not believe that the district court, on this record, erred in not reconsidering its suppression ruling sua sponte.

unable to observe the whole transaction inside No. 10 and did not see the defendant hand the three packages to Henthorn. However, he did observe Henthorn deliver something to the defendant. We consider the inference reasonable that Henthorn gave the recorded bills to the defendant in exchange for the three packets which Officer Marcano concluded contained heroin.

The defendant relies heavily upon Wong Sun v. United States to support his contention that probable cause did not exist. 371 U.S. 471 (1963). In that case, Hom Way, who had just been arrested and who had not previously acted as an informant, told a narcotics agent that one "Blackie Toy," proprietor of a laundry on Leavenworth Street in San Francisco, had sold him an ounce of heroin the night before. Federal agents then closed in on one of the many laundries on Leavenworth Street and arrested James Wah Toy as he fled to the rear of the building.[4] The name "Toy," however, was nowhere displayed on the laundry's exterior. Moreover, no evidence in the record identified James Wah Toy and "Blackie Toy" as the same person. On that record, the Supreme Court held that probable cause for Toy's arrest had not been demonstrated.

In the instant case, the record of the suppression hearing is markedly more probative of probable cause than the record in Wong Sun. Here the Government did not rely on anything Henthorn told Officers Marcano and Wells. Rather, the Government adduced visual evidence of an arresting police officer tending to show that the defendant and Henthorn engaged in a transaction and that immediately thereafter Henthorn had acquired three packages of what appeared to be heroin and had parted with the thirty dollars which the officers had given him. The defendant was

---

[4] The Court stated that "Toy's refusal to admit the officers and his flight down the hallway . . . signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion." 371 U.S. at 483.

not, as in Wong Sun, one of many who might fit an informant's description. On the contrary, the defendant was identified by Officer Marcano as the person he observed receiving something from Henthorn, and was arrested on the very premises where the transaction was observed.

■ In searching this record for probable cause, "as the very name implies, we deal with probabilities." Brinegar v. United States, 338 U.S. 160, 175 (1949). We do not seek evidence which would be sufficient to support a conviction. Rather, we must determine whether

"the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

Id., quoting Carroll v. United States, 267 U.S. 132, 162 (1925). We conclude that the Government met this test at the suppression hearing and that the district court did not err in finding probable cause.

## II

We also agree with the district court that an arrest warrant was not required in the circumstances of this case. The defendant does not contend that he was constitutionally entitled to be arrested pursuant to a warrant. We agree that he was not so entitled in this case. The defendant requests only that we, in the exercise of our supervisory powers, invalidate the arrest and order suppression of the evidence seized incident thereto.

■ Although we are not reluctant to employ our supervisory powers in appropriate cases, we decline to do so in this instance. We are aware that the police had time to procure an arrest warrant and that, in fact, they did procure a search warrant. The record shows, however, that during the approximately six hours which intervened between the observed transaction in No. 10 and the arrest, Officers Mar-

cano and Wells were engaged in staging another heroin purchase at the same location. Thus, although we strongly favor the use of the arrest warrant procedure and might exercise our supervisory powers in other circumstances, we do not think that the failure to obtain an arrest warrant in this case requires reversal.

We are hesitant, moreover, to exercise our supervisory powers where, as here, the Legislature has addressed itself to the subject.

A peace officer . . . may, without a warrant, arrest a person

(1) for a public offense committed or attempted in his presence;

(2) when a person has committed a felony, although not in his presence;

(3) when a felony has in fact been committed and he has reasonable cause for believing the person to have committed it;

(4) on a charge made, upon a reasonable cause, of the commission of a felony by the party; or

(5) at night when there is reasonable cause to believe that he has committed a felony. 5 V.I.C. § 3562.

■ Although we find the opaque language of section 3562 confounding, we believe that clause (2) can be construed to authorize the arrest here at issue. Literally read, clause (2) might be interpreted to require, as a prerequisite to a warrantless arrest, more than "reasonable cause" to believe that a person has committed a felony. We note that clause (2) does not explicitly incorporate a "reasonable cause" standard. Moreover, the omission of "reasonable cause" language from clause (2) might seem all the more significant in light of its inclusion in other clauses of the statute. Clause (3), for example, seems to differentiate between an "in fact" standard for establishing the commission of a felony and a "reasonable cause" standard for believing that the person to be arrested committed the felony. Thus, although clause (2) does not contain the words "in fact," it might be argued to require proof of

guilt rather than just "reasonable cause" before an arrest without a warrant may be made.

A statute such as section 3562 cannot be construed reasonably as requiring proof of guilt as a prerequisite to an arrest. Peace officers, whose conduct the statute seeks to regulate, must often make quick, on-the-scene decisions whether to arrest and certainly cannot be expected to engage in the judicial process which the statute might be read to require. Determination of guilt is the exclusive province of the courts which, in the relative calm of a courtroom, evaluate evidence on the record. Peace officers are not entrusted with this judicial function and, in fact, do not enjoy the luxury of dispassionate hindsight which is essential to rational guilt determinations.

A basic principle of statutory construction enjoins us from imputing to the Legislature an intent to produce an absurd result. Yankee Network, Inc. v. Federal Communications Comm'n, 107 F.2d 212, 219 & n. 34 (D.C. Cir. 1939). We therefore must not construe clause (2) as requiring proof of guilt before a warrantless arrest may be made. Even if we hold that implied in clause (2) is a "reasonable cause" standard, since we concluded above that probable cause existed to believe that the defendant committed the felony of distributing heroin, section 3562 authorized his arrest.

## III

■ ■ In addition to challenging the legality of his arrest, defendant contends

(1) that the district court's failure to replace, with an alternate, juror Gerard who was involved in printing a prejudicial newspaper article about the defendant during the trial constituted reversible error;

(2) that the Government failed to prove two essential elements of its case in that it did not introduce evidence (a) that the defendant

505

was not authorized to handle controlled substances and (b) that the Schedule of Controlled Substances containing heroin had been republished and was in effect on the date of the defendant's alleged acts; and

(3) that the district court's failure to instruct the jury on the issue of entrapment constituted plain error.

In light of the defendant's failure to request an instruction on the issue of entrapment,[5] we believe that only defendant's contentions concerning prejudicial publicity and proof of all the elements of the Government's case merit discussion.

In the evening of the first day of this two-day trial, an article referring to the defendant's prior criminal record appeared in a local newspaper. Defense counsel brought the article to the district court's attention the next day before the trial resumed and moved for a mistrial. Although the defense did not move in the alternative for replacement with an alternate of any juror who had been exposed to the article, this option was suggested by the Government and, we assume, was considered by the district court.

After a discussion of the procedure to be followed, the district court examined each juror individually to determine whether any juror had read the article. All the jurors, with the exception of juror Gerard, stated that they had not seen nor read the article. Juror Gerard stated that, although he had been involved in printing the article, he had not read it.[6] After the jurors had been reassembled, the dis-

---

[5] See Fed. R. Crim. P. 30. Even if we were to conclude that the district court's failure to instruct on the issue of entrapment is cognizable on appeal, our decision in United States v. Watson would preclude the relief which the defendant seeks. 489 F.2d 504, 507 (3d Cir. 1973).

Since he did not admit the crime charged, he was not entitled to any entrapment instruction . . . . Id., citing United States v. Hendricks, 456 F.2d at 167 (9th Cir. 1972).

[6] The transcript reveals the following examination of juror Gerard by the district court:

THE COURT: Sir, have you had the opportunity of reading today's issue of the St. Thomas Daily News?

trict court asked them collectively whether any of them had "heard, overheard or been directly told anything whatsoever about [the] article . . . ." None responded that he had.

As recently articulated by this court in United States ex rel. Doggett v. Yeager, the rule is that "if a defendant has shown the likelihood that seriously prejudicial materials may have reached the jury, due process requires some form of relief." 472 F.2d 229, 239 (3d Cir. 1973). The question here is whether that likelihood has been shown.[7]

■ The defendant characterizes as "incredible" juror Gerard's declaration under oath that he did not read the prejudicial article of which he was aware and which, in fact, he printed. The defendant therefore urges us to find "likely" the possibility that juror Gerard did read the article "but was afraid to say so because he had been previously admonished by the Judge not to read any newspaper articles concerning the case." Supplemental Brief for Appellant at 10. Juror Gerard forthrightly informed the district court that he had seen the article while at work in the printing plant but that he had not read it.

---

JUROR GERARD: I printed it last night but I didn't pay much attention to it.
THE COURT: Did you read anything at all about this case in it?
JUROR GERARD: No, you told us not to so I didn't.
THE COURT: But you did see it. You did see the paper.
JUROR GERARD: Yes.
THE COURT: Did you read any part of that story? How is the headline? "Jury Goes to Look at the Scene" or anything?
JUROR GERARD: I saw it but I didn't read it.
THE COURT: You did not read the story at all?
JUROR GERARD: No.
THE COURT: Did you read the rest of the paper?
JUROR GERARD: Yes.
THE COURT: When you got on the inside did you see anything inside there that related to this case?
JUROR GERARD: Yes, and I skipped that also.
THE COURT: You skipped that also?
JUROR GERARD: Yes.
THE COURT: So on oath you did not read any part of it?
JUROR GERARD: No.

[7] As an appellate tribunal, we "have the duty to make an independent evaluation of the circmstances." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966).

We are not willing to assume, merely on the basis of juror Gerard's admitted awareness of the article's existence, that he purposefully lied to the district court when he denied having read it. See United States v. Noah, 475 F.2d 688, 693 (9th Cir. 1973).

Clearly the better course for the district court to have followed would have been to replace juror Gerard with one of the alternates. However, the defense did not request a replacement. We do not believe that a sufficient likelihood of prejudice has been demonstrated in this case to warrant a new trial.[8]

Turning now to the defendant's next contention, we need not decide whether, in a prosecution for distributing a controlled substance, the Government must prove that the defendant was not authorized to handle the controlled substance in question. As the district court pointed out in its memorandum and order denying defendant's posttrial motions, the Government introduced sufficient circumstantial evidence to warrant a finding beyond a reasonable doubt that the defendant was not authorized to distribute heroin. The circumstantial evidence included the clandestine nature of the distribution, the place where the distribution took place, and the manner in which the heroin was packaged. Based on this evidence, the district court charged that the jury must find, as an element of the offense, that "the defendant is not a person registered and empowered to distribute or dispense [heroin]."

■ The remaining question on this appeal is whether the Government, as an element of its case, must prove that the relevant Schedule of Controlled Substances has been republished and was in effect on the date which it charges

---

[8]We note that in Doggett, unlike the present case, two jurors admitted reading a prejudicial newspaper article and may have discussed the article with the other jurors. United States ex rel. Doggett v. Yeager, supra, 472 F.2d at 232–33.

an illegal transaction took place.[9] Nineteen V.I.C. § 595(a) clearly provides that

[t]he schedules established by this section shall be updated and republished on a semi-annual basis during the two year period beginning one year after the date of enactment of this chapter [March 23, 1971] and shall be updated on an annual basis thereafter.

We believe, however, that the statute in this regard is merely directory and that republication is not an element of the crime charged.

We note first that section 604, under which the defendant was convicted, does not expressly impose a republication requirement. That section merely refers to "controlled substances" which are defined in section 595. Controlled substances, according to section 595(a), "shall initially consist of the substances listed in this section." Thus the question arises whether, in absence of republication, the substances initially listed, one of which is heroin, cease to be controlled. This question is answered definitively by section 595(c) which provides that the schedules shall consist of the substances initially listed "unless or until amended pursuant to section 594." This provision is reinforced by subdivision (b) of Schedule I, which lists heroin in that schedule "[u]nless specifically excepted or unless listed in another schedule." 19 V.I.C. § 594(c), Schedule I(b). We therefore are persuaded that the Legislature intended the substances initially listed to remain controlled substances whether or not the schedules are republished and did not intend republication to be an element of the offenses defined in section 604.

The judgment of the district court will be affirmed.

---

[9] This issue is squarely presented since the Government did not introduce any evidence tending to show republication of the schedules.